PRECEDENTIAL

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT
_____

Nos. 19-2812 and 19-3906
_____

ARTHUR DIAMOND, on behalf of himself and others
similarly situated;
JEFFREY SCHAWARTZ; SANDRA H. ZIEGLER, on
behalf of themselves
others similar situated; MATTHEW SHIVELY; MATTHEW
SIMKINS;
DOUGLAS R. KASE; JUSTIN BARRY,

Appellants in case no. 19-2812

v.

PENNSYLVANIA STATE EDUCATION ASSOCIATION;
CHESTNUT RIDGE EDUCATION ASSOCIATION,
as representative of the class of all chapters and
affiliates of the Pennsylvania State Education Association;
NATIONAL EDUCATION ASSOCIATION; JOSH
SHAPIRO,
in his official capacity as Attorney General of Pennsylvania;
JAMES M. DARBY; ALBERT MEZZAROBA; ROBERT H.
SHOOP, JR.,
in their official capacities as chairman and members of the
Pennsylvania
Labor Relations Board; LESLEY CHILDER-POTTS, in her

official capacity
as district attorney of Bedford County, and as representative
of the class
of all district attorneys in Pennsylvania with the authority to
prosecute violations
of 71 Pa. Stat. 575


JANINE WENZIG and CATHERINE KIOUSSIS,

Appellants in case no. 19-3906

v.

SERVICE EMPLOYEES INTERNATIONAL UNION
LOCAL 668

---

On Appeal from the United States District Court
for the Western District of Pennsylvania and the Middle
District of Pennsylvania
(District Court Nos.: 3-18-cv-00128 and 1-19-cv-01367)
District Judges: Honorable Kim Gibson and Honorable
Malachy E. Mannion

---

Argued April 24, 2020

(Opinion Filed: August 28, 2020)

Before:  PHIPPS, RENDELL, and FISHER, Circuit Judges

Joseph F. Canamucio, Esq.
Pennsylvania State Education Association
400 North Third Street
Harrisburg, PA 17101

Leon Dayan, Esq. [ARGUED]
Bredhoff & Kaiser
805 15th Street, N.W.
Suite 1000
Washington, DC 20005

Jacob Karabell, Esq.
Bredhoff & Kaiser
805 15th Street, N.W.
Suite 1000
Washington, DC 20005

John M. West, Esq.
Bredhoff & Kaiser
805 15th Street, N.W.
Suite 1000
Washington, DC 20005

    Counsel for Appellees Pennsylvania State
    Education Association, et al.

Daniel B. Mullen, Esq.
Office of Attorney General of Pennsylvania
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Counsel for Appellees Attorney General Joshua D. Shapiro, et al.

Jonathan F. Mitchell, Esq. [ARGUED]
Direct: 512-686-3940
Email: jonathan@mitchell.law
Fax: 512-686-3941
[COR NTC Retained]
Suite 400
111 Congress Avenue
Austin, TX 78701

Counsel for Appellants Arthur Diamond, et al.

Meredith Johnson, Esq.
Altshuler Berzon
177 Post Street
Suite 300
San Francisco, CA 94108

Scott A. Kronland, Esq.
Altshuler Berzon
177 Post Street
Suite 300
San Francisco, CA 94108

P. Casey Pitts, Esq.  [ARGUED]
Altshuler Berzon
177 Post Street
Suite 300
San Francisco, CA 94108

Counsel for Appellee Service Employees
International Union Local 668

Charles O. Beckley, II, Esq.
Beckley & Madden
212 North Third Street
Suite 301
Harrisburg, PA 17108

Brian Kelsey, Esq.  [ARGUED]
Liberty Justice Center
190 South LaSalle Street
Suite 1500
Chicago, IL 60603

William L. Messenger, Esq.
National Right to Work Legal Defense Foundation
8001 Braddock Road
Suite 600
Springfield, VA 22151

Counsel for Appellants Janine Wenzig and
Catherine Kioussis

---

O P I N I O N

---

**RENDELL**, <u>Circuit Judge</u>:

In reliance on a Pennsylvania statute and the Supreme Court's decision in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977), Appellee Unions, the Service Employees International

5

Union Local 668 and the Pennsylvania State Education Association, collected "fair-share fees" from Appellants over Appellants' objections. But the Supreme Court overruled *Abood* in *Janus v. AFSCME Council 31*, holding that state legislation condoning public-sector fair-share fees was unconstitutional. 138 S. Ct. 2448 (2018) ("*Janus I*"). Now, Appellants bring these § 1983 lawsuits seeking reimbursement of the sums they were required to pay. The District Courts, joining a consensus of federal courts across the country, dismissed Appellants' claims for monetary relief, ruling that because the Unions collected the fair-share fees in good faith reliance on a governing state statute and Supreme Court precedent, they are entitled to, and have successfully made out, a good faith defense to monetary liability under § 1983. We will affirm.

## I

### A. Legal background

Labor laws in the United States have long authorized employers and labor organizations to bargain for an "agency shop," an arrangement in which one union is allowed to exclusively represent an entity's employees on the condition that the union represent *all* the entity's employees—even those who do not join the union. *See, e.g.*, *Janus I*, 138 S. Ct. at 2460; 45 U.S.C. § 152 (Railway Labor Act); 29 U.S.C. § 159 (National Labor Relations Act). Agency shop arrangements are intended to promote uniform bargaining, streamlined administration, and other interests, but they also create an incentive for employees to decline to join their union (and therefore avoid paying dues) while still accruing the benefits of union representation. *See, e.g.*, *Janus I*, 138 S. Ct. at 2465-69 (describing the intended purpose of agency shops to create

6

"labor peace" and describing the hypothetical potential for "free rider" problems in agency shop arrangements). To address this incentive, Congress often allowed unions and employers who opt for an agency shop arrangement to require all employees either to join the union and pay dues or, if an employee does not join the union, to nonetheless contribute to the costs of representation, bargaining, and administration of bargaining agreements. This requirement that non-members pay some form of union dues is often referred to as a "fair-share" fee, and is present in various pieces of federal legislation, including, for instance, the Railway Labor Act, 45 U.S.C. § 152, and the National Labor Relations Act, 29 U.S.C. §§ 157, 158(a)(3).

The Supreme Court has upheld the constitutionality of these agency shop arrangements, including fair-share fees. For instance, in *Railway Employees' Dep't v. Hanson*, the Supreme Court ruled that the Railway Labor Act's provisions allowing agency shop arrangements and fair-share fees did not violate the First Amendment. 351 U.S. 225, 236-38 (1956). Although the employees in that case argued that the agency shop "agreement forces men into ide[o]logical and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought protected by the Bill of Rights," *id.* at 236, the Court "h[e]ld that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work . . . does not violate" the First Amendment, *id.* at 238. The Supreme Court later reaffirmed this ruling. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749 (1961) (affirming the constitutionality of the Railway Labor Act's agency shop and fair-share provisions).

7

Eventually, state legislatures across the country passed laws authorizing public-sector unions to collect fair-share fees and bargain for agency shop arrangements with state government employers. In *Abood*, the Supreme Court affirmed the constitutionality of one such law, a Michigan statute permitting state employers to negotiate for agency shop arrangements and fair-share fees with the public-sector unions that represented their employees. 431 U.S. at 224-26. The *Abood* Court ruled that the important government interests in creating functional and peaceful labor relations and preventing the free rider problem "support the impingement upon associational freedom created by the agency shop." *Id.* at 225. Although the Court recognized that the "government may not require an individual to relinquish rights guaranteed [] by the First Amendment as a condition of public employment," *id.* at 234, the Court held that there was no reason to distinguish *Abood* from cases like *Hanson* that had upheld agency shop arrangements in the private sector, *id.* at 232 (holding that the "differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights").

But the *Abood* Court also ruled that—as in the private sector—non-members' fair-share fees could only be used to pay for union activities that were "germane to [the union's] duties as collective-bargaining representative," but not the union's political or other work. *Id.* at 235. In the *Abood* Court's view, this limitation struck an appropriate balance between the non-members' speech rights under the First Amendment and the government's interests in regulating labor relations. *Id.* at 237 (describing the Court's ruling as "preventing compulsory subsidization of ideological activity by employees who object . . . without restricting the [u]nion's

8

ability to require every employee to contribute to the cost of collective-bargaining activities"). Over the course of the following four decades, the Supreme Court affirmed its holding in *Abood* against similar challenges to the constitutionality of state laws allowing for agency shop arrangements between public-sector employers and public-sector unions. *See, e.g.*, *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991); *Locke v. Karass*, 555 U.S. 207 (2009); *Friedrichs v. Cal. Tchrs. Ass'n*, 136 S. Ct. 1083 (2016) (per curiam) (equally divided Court affirming without opinion).

In light of *Abood*, Pennsylvania enacted a law allowing public-sector agency shop arrangements and authorizing unions that serve as exclusive representatives to collect fair-share fees. *See* 71 Pa. Stat. and Cons. Stat. Ann. § 575 (West 2020). Under section 575(b), "[i]f the provisions of a collective bargaining agreement so provide, each nonmember of a collective bargaining unit shall be required to pay to the exclusive representative a [fair-share] fee." Fair-share fees could consist of normal dues minus "the cost for the previous fiscal year of [the union's] activities or undertakings which were not reasonably employed to implement or effectuate the duties of the employe[e] organization as exclusive representative." *Id.* § 575(a). The law also set forth the procedure by which fair-share fees would be deducted from non-member employees' paychecks, *see id.* § 575(c), and a procedure through which non-member employees could obtain information about how their fees were used, *see* § 575(d). If this information reflected any improper uses, non-members could challenge the fair-share fees. *See id.* § 575(e).

In 2018, the Supreme Court "overruled" *Abood*. *Janus I*, 138 S. Ct. at 2460. Holding that *Abood* "was poorly reasoned" and led to "practical problems and abuse," the Court

9

ruled that *Abood* was "inconsistent with other First Amendment cases" and was not entitled to continued precedential status. *Id.* The *Janus I* Court held that *Abood* had mischaracterized the government's interests in promoting "labor peace" and preventing "free-riders." *Id.* at 2465-70. Whereas the *Abood* Court had decided that those interests justified the fair-share fee laws' impingement on the union non-members' speech rights, the Court in *Janus I* stated that, instead, "'labor peace' can readily be achieved through means significantly less restrictive of associational freedoms," and that "avoiding free riders is not a compelling interest." *Id.* at 2466 (internal quotation marks and citations omitted).

Accordingly, "the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay." *Id.* at 2467. State legislation allowing public-sector employers and public-sector unions to collect fair-share fees unconstitutionally forced non-members "to subsidize a union, even if they choose not to join and strongly object to positions the union takes in collective bargaining and related activities," and thereby compelled non-members "to subsidize private speech on matters of substantial public concern." *Id.* at 2459-60. On this basis, the Court ruled that "[s]tates and public-sector unions may no longer extract agency fees from nonconsenting employees." *Id.* at 2486. Therefore, under *Janus I*, Pennsylvania's public sector agency shop law was no longer constitutional.[1]

---

[1] We assume without deciding that the right announced by the Supreme Court in *Janus I* is retroactive. *Janus v. AFSCME, Council 31*, 942 F.3d 352, 360 (7th Cir. 2019) ("*Janus II*")

## B. Factual background

### 1. *Diamond* facts

Plaintiff Arthur Diamond and his six co-plaintiffs (the "Diamond Plaintiffs") are current or former teachers in Pennsylvania public schools. They were not members of the Pennsylvania State Education Association ("PSEA"), the union that exclusively represented their bargaining unit. But PSEA's collective bargaining agreement contained a fair-share clause that required they pay fair-share fees to either the union or to a union-approved nonreligious charity. *See* Diamond Appellants' Br. at 5 (citing D.A. 73-74). Only Diamond paid his fair-share fee to PSEA. *Id.* at 6. The other six Plaintiffs directed their fees to be diverted to nonreligious charities, though Sandra H. Ziegler did not identify a charity. *Id.* at 5-6. The fair-share fees were no longer collected after June 27,

---

("Rather than wrestle the retroactivity question to the ground, we think it prudent to assume for the sake of argument that the *right* recognized" by the Supreme Court in *Janus I* is retroactive.); *Danielson v. Inslee*, 945 F.3d 1096, 1099 (9th Cir. 2019) ("[W]e will assume that the right delineated in [*Janus I*] applies retroactively and proceed to a review of available remedies."); *Lee v. Oh. Educ. Ass'n*, 951 F.3d 386, 389 (6th Cir. 2020) ("[T]he most prudent course of action is to assume without deciding that the right recognized in [*Janus I*] has retroactive application."). Even if *Janus I* is retroactive, the good faith defense may constitute a "previously existing, independent legal basis" for denying the Appellants' claims. *See Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995).

11

2018, the date that the Supreme Court issued its decision in *Janus I*. A. 74, 93-96.

The Diamond Plaintiffs originally sued PSEA on the same theory as the plaintiffs in *Janus I*, but once the Supreme Court ruled in that case, the Diamond Plaintiffs amended their Complaint to seek repayment of the fair-share fees they had previously paid to their union. *See* Diamond Appellants' Br. at 6. PSEA moved to dismiss the amended complaint, arguing that because it had collected the fees in good faith reliance on a Pennsylvania statute and pre-*Janus I* Supreme Court precedent authorizing fair-share fees, they could not be held liable for monetary damages. *Id.* at 7. The District Court granted the motion to dismiss, ruling that because PSEA had relied on a prevailing state statute and federal caselaw, they were entitled to a good faith defense to § 1983 liability that barred the Diamond Plaintiffs' claims. D.A. 50-51. The Diamond Plaintiffs timely appealed. D.A. 1.

### 2. *Wenzig* facts

Janine Wenzig and Catherine Kioussis (the "Wenzig Plaintiffs") work for the Commonwealth of Pennsylvania. W.A. 8. Like the Diamond Plaintiffs, they were forced to pay fair-share fees to their union, the Service Employees International Union Local 668, without their consent. *Id.* Their bargaining unit's CBA contained the following provision:

> The Employer further agrees to deduct a [fair-share] fee from all compensation paid to all employees in the bargaining unit who are not members of the Union. Authorization from non-members to deduct [fair-share] fees shall not be

12

required. The amounts to be deducted shall be certified to the Employer by the Union and the aggregate deductions of all employees shall be remitted together with an itemized statement to the Union by the last day of the succeeding month after such deductions are made.

Wenzig App. 42.

More than a year after *Janus I* was issued, the Wenzig Plaintiffs filed suit on behalf of themselves and a putative class of similarly situated employees to recover damages under § 1983 for the fair-share fees that they had paid to their union. *See* Wenzig Appellants' Br. at 3. They sought a declaratory judgment that the union's pre-*Janus I* collection of fair-share fees violated the First Amendment and repayment of all fair-share fees that were collected. W.S.A. 9.

The SEIU filed a motion to dismiss their claims, which the District Court granted. The District Court ruled the good faith defense shielded the union from monetary liability for collecting fair-share fees in good faith reliance on then-prevailing Supreme Court precedent. W.A. 16. The Wenzig Plaintiffs timely appealed, and their case was consolidated for argument and opinion with the Diamond Plaintiffs' case. W.A.1.

## II

The District Courts had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291. We review the District Courts' judgments granting the Defendants' motions to dismiss *de novo. See, e.g.*,

13

*Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014).

## III

We are not the first court of appeals to rule on this question, and we join a growing consensus of our sister circuits who, in virtually identical cases, have held that because the unions collected the fair-share fees in good faith reliance on a governing state statute and Supreme Court precedent, they are entitled to a good faith defense that bars Appellants' claims for monetary liability under § 1983. *See Janus v. AFSCME, Council 31*, 942 F.3d 352 (7th Cir. 2019) ("*Janus II*"); *Mooney v. Ill. Educ. Ass'n*, 942 F.3d 368 (7th Cir. 2019); *Danielson v. Inslee*, 945 F.3d 1096 (9th Cir. 2019); *Lee v. Oh. Educ. Ass'n*, 951 F.3d 386 (6th Cir. 2020); *Ogle v. Ohio Civil Serv. Emps. Ass'n, AFSCME Local 11*, 951 F.3d 794 (6th Cir. 2020); *Wholean v. CSEA SEIU Local 2001*, 955 F.3d 332 (2d Cir. 2020).

### A.   Private parties may assert a good faith defense to § 1983 liability.

42 U.S.C. § 1983 creates a cause of action for plaintiffs who are injured by a person who, acting "under color of any statute . . . of any State," causes the plaintiff to suffer "the deprivation of any rights, privileges, or immunities secured by the Constitution." Appellants assert that the Unions—acting under color of a Pennsylvania statute—caused them to be deprived of their First Amendment rights when the Unions collected fair-share fees from Appellants' paychecks.

In *Lugar v. Edmondson Oil Co.*, the Supreme Court held that § 1983 allows suits against private parties acting under

color of state law.  457 U.S. 922, 941 (1982).  Under *Lugar*, a private party may be liable under § 1983 when the private-party defendant deprived the plaintiff of a constitutional right by exercising "a right or privilege having its source in state authority" and where the private-party defendant may be "appropriately characterized as [a] 'state actor[].'" *Id.* at 939.[2] But while the *Lugar* Court confirmed that private-party defendants may be subject to suit under § 1983, the Court also recognized a "concern" that its ruling could unfairly subject these private entities to liability even though the private parties had "innocently [made] use of seemingly valid state laws." *Id.* at 942 n.23.

Despite voicing this "concern," the Court in *Lugar* left open the question of whether private parties may avail themselves of immunity to suit.  *Id.*  In *Wyatt v. Cole*, the Supreme Court answered this question, ruling that immunity is reserved for governmental entities, not private parties subject to suit under § 1983.  504 U.S. 158, 168 (1992).  The Court nonetheless noted—without explicitly ruling—that "principles of equality and fairness may suggest . . . that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability."  *Id.*  But the Court left the question of whether private-party defendants are entitled to a "defense based on good faith" for "another day."  *Id.* at 169.  Later, the

---

[2]  Under *Lugar*, a private party may be appropriately characterized as a state actor where the private party "is a state official, . . . has acted together with or has obtained significant aid from state officials, or [where its] conduct is otherwise chargeable to the State."  *Lugar*, 457 U.S. at 937.  Appellants do not challenge the Unions' statuses as state actors.

Supreme Court again alluded to, without adopting, this good faith defense. *See Richardson v. McKnight*, 521 U.S. 399, 414 (1997) ("Like the Court in *Wyatt*, . . . we do not express a view on [the good faith defense].").

We addressed this open question shortly after *Wyatt* was issued. In *Jordan v. Fox, Rothschild, O'Brien & Frankel*, we held that a "good faith defense is available" to private parties who act under color of state law and are sued for monetary liability under § 1983. 20 F.3d 1250, 1277 (3d Cir. 1994). We stated our "basic agreement" that "private defendants should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity." *Id.* at 1276 (citations omitted). We noted that good faith gives private defendants "a defense that depends on their subjective state of mind, rather than the more demanding objective standard of reasonable belief that governs qualified immunity." *Id.* at 1277.[3]

---

[3] In his concurrence, JUDGE FISHER suggests that a historical approach to the issue of good faith requires a complex analysis based on common law. He asserts that the various opinions in *Wyatt* imply "that any limitation on private-party liability must be grounded in the common-law approach." Fisher Op. at I.C. JUDGE PHIPPS similarly urges that the good faith defense should be available if and only if a "deeply rooted common-law tradition exists" to support it. *See* Phipps Op.

I can find no such implication, let alone any directive to that effect. Indeed, the point—the very narrow ruling—of the majority in *Wyatt* is that qualified immunity is uniquely a creature of common law to which private parties are not entitled. And the *Wyatt* concurrence's statement (which Judge Fisher quotes as the basis for this implication), that "[w]e may

16

not transform what existed at common law based on our notions of policy or efficiency," 504 U.S. at 171-72, did no more than provide support for the majority's reasoning rejecting an expansion of the concept of qualified immunity, and speaks not at all to the issue of the good faith defense or its contours.

JUDGE FISHER also suggests that my reading of *Jordan* is "expansive[]," Fisher Op. at II.B., and JUDGE PHIPPS "does not see a valid basis for recognizing such a defense," Phipps Op., but urges that, instead, our adoption of the good faith defense in *Jordan* was a "misnomer," *id.*

I disagree. In *Jordan*, we embraced the good faith defense and opined on the contours of its relatively modest requirements. 20 F.3d at 1275-77. We concluded that good faith gives private actors a defense that depends on their "subjective state of mind," *id.* at 1277, and looked to whether the private party acted with "malice" or "either knew or should have known of the statute's constitutional infirmity," *id.* at 1276. And I note that, importantly, in *Jordan*, we made no mention of the common-law approach. *Jordan* is controlling precedent as to the legal standard that we apply in this case.

And let us be clear: we are not talking about an across-the-board good faith defense to a § 1983 action that is inconsistent with the common law. Instead, we are talking about prohibiting monetary liability when a private-party defendant acted in good faith reliance on a statute enacted in accordance with binding Supreme Court precedent in a situation that has no exact analogue at common law. Doesn't the analogy to abuse of process in note 4 below—or, in its own way, JUDGE FISHER's intensive historical analysis—make that very point? *See also, e.g.*, *Janus II*, 942 F.3d at 365 (noting that no common law tort "is a perfect fit").

17

**B.** **Appellants' § 1983 claims are barred by the Unions' good faith defense.**

*Jordan* therefore established that the good faith defense is available to a private-party defendant in a § 1983 case if, after considering the defendant's "subjective state of mind," *id.* at 1277, the court finds no "malice" and no "evidence that [the defendant] either knew or should have known of the statute's constitutional infirmity," *id.* at 1276.

There was no such finding of malice or knowledge in *Jordan*, and, similarly here, Appellants have not asserted that either of these disqualifying factors is implicated. Indeed, as noted above, the Unions' collection of fair-share fees was authorized by over four decades of Supreme Court precedent and a Pennsylvania statute, 71 Pa. Stat. and Cons. Stat. Ann. § 575 (West 2020), that explicitly authorized fair-share fees for public-sector unions like the Unions. Accordingly, in this case, Appellants cannot possibly make any "showing of malice" or demonstrate that the Unions "either knew or should have known of [§ 575]'s constitutional infirmity." *Jordan*, 20 F.3d at 1276 (citation omitted). The Unions are therefore entitled to the good faith defense under *Jordan*.

---

This is not the huge jurisprudential leap that my colleagues urge. This is a reasonable way to afford private parties some of the protection that government actors are afforded when they act in a situation in which the existing state and federal law explicitly condoned their behavior. Do we need to chart a complex path to ensure that this underlying principle is recognized? We did not in *Jordan*, and we do not need to do so here.

18

Moreover, "principles of equality and fairness," *Wyatt*, 504 U.S. at 168, independently weigh in favor of the Unions being protected from suit. It is fair—and crucial to the principle of rule of law more generally—that private parties like the Unions should be able to rely on statutory and judicial authorization of their actions without hesitation or fear of future monetary liability. *Janus II*, 942 F.3d at 366 ("The Rule of Law requires that parties abide by, and be able to rely on, what the law *is* . . . ."); *Danielson*, 945 F.3d at 1105 (finding that the defendant unions did "exactly what we expect of private parties: adhering to the governing law of its state and deferring to the Supreme Court's interpretations of the Constitution"); *Wholean*, 955 F.3d at 336 (noting that unions "cannot reasonably be deemed to have forecasted whether, when, and how *Abood* might be overruled" and holding that they "were entitled to rely on directly controlling Supreme Court precedent").

Appellants present numerous arguments that the good faith defense should not bar their claims against the Unions. First, Appellants urge us to rule that the good faith defense only applies to § 1983 suits that allege theories of liability for which the most analogous common law tort requires malice or probable cause. We decline to do so for several reasons. First, *Wyatt* applied this most analogous tort concept in considering the way courts have analyzed immunity from suit under § 1983. The *Wyatt* Court did not mention this concept in relation to the good faith defense and there is no reason to think that it would apply a historical immunity analysis to what it obviously considered to be a distinct good faith analysis. *See Wyatt*, 504 U.S. at 168. Other courts have concurred in this view. *See Danielson*, 945 F.3d at 1101 (observing that *Wyatt*'s discussion of the most closely analogous common law tort

19

"applies only to . . . qualified immunity" and not to the good faith defense); *Janus II*, 942 F.3d at 365 ("[T]he Supreme Court in *Wyatt*[] embarked on the search for the most analogous tort only for *immunity* purposes—the Court never said that the same methodology should be used for the good-faith defense."); *Lee*, 951 F.3d at 392.  In any event, because the legal basis for § 1983 immunity is distinct from the legal basis for the good faith defense, we see no independent reason to adopt the most analogous common law tort inquiry here.  *See Danielson*, 945 F.3d at 1101 ("The rationales behind [immunity and the good faith defense], and their limitations, are not interchangeable.").  Instead, as noted above, our decision is based on the "principles of equality and fairness" identified in *Wyatt*.  504 U.S. at 168.[4]

---

[4] We note that the Appellants did not urge (or even suggest) that we delve into the historical "common-law approach" with the level of historical detail and specificity that JUDGE FISHER's concurrence would require, so we need not consider it.  Our sister circuits have construed what JUDGE FISHER refers to broadly as the "common-law approach" as a narrower most analogous common law tort approach, and, although they ultimately reject the idea that this approach should be incorporated into our analysis, they have uniformly determined that, even if we were to adopt this mode of analysis, abuse of process is the most analogous common law tort on these facts. *See Janus II*, 942 F.3d at 365; *Danielson*, 945 F.3d at 1102; *Lee*, 951 F.3d at 392 n.2; *cf. Ogle*, 951 F.3d at 797.  Abuse of process, which provides a "cause[] of action against private defendants for unjustified harm arising out of the misuse of governmental processes," *Wyatt*, 504 U.S. at 164, corresponds to the Unions' use of a Pennsylvania statute to collect fair-share

20

Next, Appellants cite numerous cases in which defendants who have taken money or property in violation of a plaintiff's constitutional rights have been required to disgorge or return the money or property. First, most of these cases involved government defendants, not private parties. But in addition, one of the main considerations in *Abood* was the benefit conferred on plaintiffs by the union activities. This has no role in the various cases cited by Appellants. But it does play a role when we are considering fairness because Appellants benefitted from the fair-share fees they paid. Thus, we are not disputing that a cause of action for return of money or property exists for Appellants. We are merely saying that principles of fairness make this situation different.

Third, Appellants urge that the good faith defense does not apply to claims for restitution, which they allegedly seek. But contrary to their urging, Appellants' claims do not constitute claims for restitution. "[R]estitution in equity typically involved enforcement of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657 (2016)

---

fees through government employer payroll withholding. Abuse of process also requires a showing of malice and probable cause, which would support the availability of the good faith defense here. *Id.*; *see also Jordan*, 20 F.3d at 1275-77. So, although JUDGE FISHER's opinion goes well beyond an analogy to abuse of process in its "common-law approach," *see* Fisher Op. at II.B.-III.B., I would not go so far, even if I were to look to the common law for guidance on this issue.

21

(quotation marks and citation omitted).  In contrast, where a plaintiff pursues a "personal claim against the defendant's general assets," then that plaintiff is seeking "a *legal* remedy, not an equitable one."  *Id.* at 658.  Appellants have not demonstrated that their lawsuit seeks recovery from anything more specific than the Unions' general assets, and therefore they fail to persuade us that they are suing for restitution.  *See also Mooney*, 942 F.3d at 371 (finding that the plaintiff's claim was "[i]n substance . . . one for damages"); *Danielson*, 945 F.3d at 1102-03; *Lee*, 951 F.3d at 391.

Appellants next theorize that the Unions can only avoid liability—even if there is a good faith defense—if they acted appropriately to benefit Appellants as *Abood* reasoned.  Thus, they urge that the District Courts should not have dismissed their claims without allowing discovery as to whether the Unions' conduct was consistent with what *Abood* required.  But because Appellants have pled an entitlement to return of their money based on *Janus I*, not on the Unions' conduct, this argument falls flat.  *See Danielson*, 945 F.3d at 1105 (noting that because plaintiffs' "claims arise from the [u]nion's reliance on *Abood*, not allegations that the [u]nion flouted that authority, the [u]nion need not show compliance with *Abood*'s strictures to assert successfully a good faith defense"); *Lee*, 951 F.3d at 392 ("[I]f Defendants improperly spent the fair-share fees, Plaintiff would have an independent *Abood* claim but it would not render the exaction of the fee an act in bad faith." (citation omitted)).

Finally, Appellants argue that an "entity"—as opposed to an "individual"—cannot invoke the good faith defense.  But this argument is plainly contradicted by our ruling in *Jordan*, which made the good faith defense available to a law firm.  *Jordan*, 20 F.3d at 1277; *see also Danielson*, 945 F.3d at 1100

22

(rejecting argument that only individuals may invoke the good faith defense). Appellants' argument that the good faith defense is incompatible with the text of § 1983 falls flat for the same reason: *Jordan* involved a § 1983 cause of action. *Jordan*, 20 F.3d at 1277.

## IV

As Judge Wood noted in *Janus II*, the good faith defense to section 1983 liability is "narrow" and "only rarely will a party successfully claim to have relied substantially and in good faith on both a state statute *and* unambiguous Supreme Court precedent validating that statute." 942 F.3d at 367. In this unique circumstance, the good faith defense applies here to protect the Unions from monetary liability under § 1983. Accordingly, we will affirm the District Courts' judgments.

*Diamond v. Pa. State Educ. Ass'n*, No. 19-2812

*Wenzig v. Serv. Emps. Int'l*, No. 19-3906

FISHER, *Circuit Judge*, concurring in the judgment.

In April 1871, Congress passed, and President Grant signed, an extraordinary act, variously called the Ku Klux Klan Act, Third Force Act, or Civil Rights Act of 1871. On its face, the first section of that act—what we now know as 42 U.S.C. § 1983—provided its violators no immunities from or defenses to liability. *See* Act of Apr. 20, 1871, ch. 22, § 1, 17 Stat. 13, 13. Of course, the Supreme Court has since read immunities and defenses into § 1983, but it has done so principally on the conceit that they were available at common law in 1871, and implicitly incorporated into the statute. While this approach certainly limits the scope of liability, it also constrains judges from straying too far from the statutory text. In only one context has the Court invented a freestanding defense: the qualified immunity of certain state officials. Whatever might be said for that doctrine—and it is increasingly under scrutiny—I believe that the precedent of neither the Supreme Court nor our own Court warrants another divergence from the common-law approach in the present context. And however strongly considerations of equality and fairness might recommend such action, it is beyond our remit to invent defenses to § 1983 liability based on our views of sound policy. I must, therefore, respectfully disagree with the reasoning of JUDGE RENDELL's opinion announcing the Court's judgment.

Nevertheless, I concur in the affirmance of the District Courts' orders. There was available in 1871, in both law and equity, a well-established defense to liability substantially similar to the liability the unions face here. Courts consistently

1

held that judicial decisions invalidating a statute or overruling a prior decision did not generate retroactive civil liability with regard to financial transactions or agreements conducted, without duress or fraud, in reliance on the invalidated statute or overruled decision. Because this defense comports with the history and purposes of § 1983, I conclude that it is available to the unions here and supports the dismissal of the plaintiffs' complaints.

I

A

Section 1983 "cannot be understood in a historical vacuum." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981). Despite the statute's "general language," *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951), creating a form of liability in law and equity that seemingly "admits no immunities," *Tower v. Glover*, 467 U.S. 914, 920 (1984), the Supreme Court has consistently construed § 1983 "in the light of common-law principles that were well settled at the time of its enactment," *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997). Those principles "provide the appropriate starting point" for "defining the elements of damages [under § 1983] and the prerequisites for their recovery," *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978), including any available immunities and defenses, *see Pulliam v. Allen*, 466 U.S. 522, 529 (1984).

The paradigm application of this common-law approach has been the absolute immunity of legislators, judges, and certain other state officials. Congress, the Supreme Court has said, gave "no clear indication" in passing § 1983 that it "meant to abolish wholesale all common-law immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *see also Bauers v. Heisel*, 361 F.2d 581, 587-88 (3d Cir. 1966) (en banc). As a result, when an official asserts absolute immunity, the Court has demanded "a

2

considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976). This inquiry involves "consult[ing] the common law to identify those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed." *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012); *see also Burns v. Reed*, 500 U.S. 478, 484-86 (1991); *Imbler*, 424 U.S. at 422-24; *Pierson*, 386 U.S. at 553-54; *Tenney*, 341 U.S. at 376. While the scope of immunity at common law in 1871 does not exclusively define its scope under § 1983—the statute is not "simply a federalized amalgamation of pre-existing common-law claims," *Rehberg*, 566 U.S. at 366—the inquiry nevertheless remains grounded in historical analogy. Judges "do not have a license to create immunities based solely on [their] view of sound policy." *Id.* at 363.

Even when absolute immunity does not apply, the Court has still employed the common law approach. To "defin[e] the contours and prerequisites of a § 1983 claim," *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017), it has read the statute "against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305-06 (1986). In particular, the Court has looked to "[t]he common-law cause of action . . . [that] provides the closest analogy to claims of the type considered" pursuant to § 1983. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019). Yet here too, the elements and limitations of a § 1983 claim will not necessarily be co-extensive with the most analogous common-law cause of action. "Common-law principles are meant to guide rather than to control the

3

definition of § 1983 claims," and so "[i]n applying, selecting among, or adjusting common-law approaches, courts must closely attend to the values and purposes of the constitutional right at issue." *Manuel*, 137 S. Ct. at 921.

B

The singular exception to this practice is the doctrine of qualified immunity. Early on, the Court did refer to the common law. In *Pierson*, which concerned common-law and § 1983 claims against police officers, the Court held that because "the defense of good faith and probable cause" was "[p]art of the background of tort liability[] in the case of police officers making an arrest," it was available to the officers in the § 1983 action as well as the common-law action. 386 U.S. at 556-57 (citing *Monroe*, 365 U.S. at 187). Soon, however, as it confronted cases involving other executive officials, the Court generalized this defense without regard to its common-law moorings. "[T]he relevant question" became "whether [the official] 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [the plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [the plaintiff].'" *O'Connor v. Donaldson*, 422 U.S. 563, 577 (1975) (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)); *see also Procunier v. Navarette*, 434 U.S. 555, 561-62 (1978); *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974).

This drift culminated in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), where "the Court completely reformulated qualified immunity along principles not at all embodied in the common law," *Anderson v. Creighton*, 483 U.S. 635, 645

4

(1987).[1] The Court abandoned any reference to a subjective good-faith standard, noting that such "[i]nquiries . . . can be peculiarly disruptive of effective government." *Harlow*, 457 U.S. at 817. Instead, the question was now purely one of objective reasonableness, and it would apply "across the board," *id.* at 821 (Brennan, J., concurring) (citation omitted), to all "government officials performing discretionary functions," *id.* at 818 (majority opinion).

Yet even as it departed from the common-law model, the Court indicated its unwillingness to extend *Harlow*'s policy-based rationale to other contexts. "We reemphasize," it said in 1986, "that our role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice, and that we are guided in interpreting Congress' intent by the common-law tradition." *Malley v. Briggs*, 475 U.S. 335, 342 (1986); *see also Filarsky v. Delia*, 566 U.S. 377, 389 (2012) ("Nothing about the reasons we have given for recognizing immunity under § 1983 counsels against carrying forward the common law rule."). Outside of qualified immunity, the "general approach" remained the same: a court first determines "whether an official claiming immunity under § 1983 can point to a common-law counterpart to the privilege he asserts"; if a sufficiently analogous counterpart exists, the court is then to "consider[] whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions." *Malley*, 475 U.S. at 339-40 (citation omitted).

---

[1] Although *Harlow* arose under the cause of action created in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Court saw no reason to distinguish between that context and § 1983, *see Harlow*, 457 U.S. at 818 n.30.

## C

This background informs the context we confront in these cases—the far less developed area of private-party liability under § 1983. Any limitation on such liability should, as with official liability, "be dealt with . . . by establishing an affirmative defense." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 n.23 (1982); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 174 n.44 (1970) (citing *Pierson*, 386 U.S. 547). The Supreme Court has not, however, definitively stated what such a defense might be. Rather, in *Wyatt v. Cole*, 504 U.S. 158 (1992), it refused to apply *Harlow*-style qualified immunity to private parties sued under § 1983 for invoking a state replevin statute later declared unconstitutional. And that is where the doctrine remains. JUDGE RENDELL's opinion suggests that in rejecting the application of qualified immunity, *Wyatt* opened the door to another freestanding, judge-made defense. In my view, however, *Wyatt* stands for the proposition that the common-law approach must guide any limitation on private-party liability under § 1983.

The *Wyatt* defendants were private parties who invoked a Mississippi statutory procedure that obliged state officials, solely upon the declaration of the applicant, "to issue a writ of replevin for the seizure of the property described in [the] declaration." *Wyatt v. Cole*, 710 F. Supp. 180, 182 (S.D. Miss. 1989). The plaintiff, whose property had been seized, filed an action under § 1983 seeking damages and a declaratory judgment on the statute's constitutionality. The district court declared the statute unconstitutional but declined to hold the private defendants monetarily liable. *Id.* at 183. The Fifth Circuit affirmed, finding the defendants entitled to qualified immunity. *Wyatt v. Cole*, 928 F.2d 718, 721-22 (5th Cir. 1991) (per curiam).

6

In reversing, the Supreme Court distinguished between post-*Harlow* qualified immunity and a good-faith defense. The basic approach, the Court said, is the one grounded in the common law: whether the "parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871"; and, if so, whether "§ 1983's history or purpose counsel against applying [the immunity] in § 1983 actions." *Wyatt*, 504 U.S. at 164. The defendants in fact argued along these lines, claiming a defense under *Pierson* because they acted without malice and with probable cause. *Id.* at 165. The Court's response was telling: "Even if there were sufficient common law support to conclude that [the defendants] . . . should be entitled to a good faith defense, that would still not entitle them to what they sought and obtained in the courts below: the qualified *immunity* from suit accorded government officials under *Harlow*." *Id.* As to that issue, the Court concluded that the "special policy concerns," articulated in *Harlow*, that "mandat[e] qualified immunity for public officials are not applicable to private parties." *Id.* at 167.

For present purposes, this holding has two relevant implications. First, contrary to what some of our sister circuits have said, the Court in *Wyatt* made no suggestion that the common-law approach applies only in the context of immunity and not in the context of a good-faith defense. *See Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 942 F.3d 352, 365-66 (7th Cir. 2019) (*Janus II*); *Danielson v. Inslee*, 945 F.3d 1096, 1101 (9th Cir. 2019); *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 391-92 (6th Cir. 2020). In fact, the implication was precisely the opposite: "we do not foreclose the possibility," the Court wrote, "that private defendants . . . could be entitled to an affirmative defense based on good faith and/or probable cause." *Wyatt*, 504 U.S. at 169. That is the same defense *Pierson* recognized, explicitly deriving it by analogy from the

7

common law. It was also the argument that the defendants in *Wyatt* made before the Court, but which was "of no avail" because it was neither sought nor ruled upon in the lower courts. *Id.* at 165. And, accordingly, it was the basis of the Fifth Circuit's recognition of a good-faith defense on remand. *See Wyatt v. Cole*, 994 F.2d 1113, 1120 (5th Cir. 1993) (*Wyatt II*).[2]

Second, in declining to extend qualified immunity to private-party defendants, the Court did not imply, as today's opinion announcing our judgment holds, *see* Rendell Op. at III.B, that alternative policy grounds might supply an affirmative defense.

> Although principles of equality and fairness may suggest . . . that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts, such interests are not sufficiently similar to the traditional purposes of qualified immunity to justify such an expansion.

*Wyatt*, 504 U.S. at 168. Rather than open the door to an independent defense based on "principles of equality and fairness," this statement asserts that, at least in the context of private-party § 1983 defendants, equality and fairness

---

[2] Moreover, the distinction between immunities and defenses is potentially misleading because qualified immunity is itself "an affirmative defense that must be pleaded by a defendant official." *Harlow*, 457 U.S. at 815 (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). As I note above, the relevant distinction in *Wyatt* is between *Harlow*-style qualified immunity and a good-faith defense based on the common-law approach.

considerations are not significant enough in themselves to warrant divergence from the common-law model in the manner of *Harlow*. Those concerns "may be well founded," but courts "do not have a license to establish immunities from § 1983 actions in the interests of what [they] judge to be sound public policy." *Tower*, 467 U.S. at 922-23.

Justice Kennedy's concurrence in *Wyatt*, joined by Justice Scalia, underlines both of these points. "Our immunity doctrine," he wrote, "is rooted in historical analogy, based on the existence of common-law rules in 1871, rather than in 'freewheeling policy choices.'" *Wyatt*, 504 U.S. at 170 (Kennedy, J., concurring) (alteration omitted) (quoting *Malley*, 475 U.S. at 342). Although *Harlow* "depart[ed] from history in the name of public policy," Justice Kennedy joined the Court's opinion in resisting "exten[sion] [of] that approach to other contexts." *Id.* at 171. "[W]e may not transform what existed at common law based on our notions of policy or efficiency." *Id.* at 171-72. The implication is that any limitation on private-party liability must be grounded in the common-law approach.

Justice Kennedy then went further than the Court in laying out what such an inquiry, at least on the *Wyatt* facts, should look like. All of the Justices, including those in dissent, accepted that at common law in 1871 the tort actions "most closely analogous" to the *Wyatt* action were "malicious prosecution and abuse of process." *Id.* at 164 (majority opinion); *see id.* at 172 (Kennedy, J., concurring); *id.* at 176 (Rehnquist, C.J., dissenting). Both torts required the plaintiff to prove that the defendant acted with malice and without probable cause. *Id.* at 166 n.2 (majority opinion); *id.* at 172 (Kennedy, J., concurring); *id.* at 176 n.1 (Rehnquist, C.J., dissenting). For Justice Kennedy, proof of "subjective bad faith on the part of the defendant"—rather than an objective standard—went "far towards proving" both elements. *Id.* at

9

173 (Kennedy, J., concurring). "[T]here is support in the common law," he observed, "for the proposition that a private individual's reliance on a statute, prior to a judicial determination of unconstitutionality, is considered reasonable as a matter of law; and therefore under the circumstances of this case, lack of probable cause can *only* be shown through proof of subjective bad faith." *Id.* at 174 (citing *Birdsall v. Smith*, 122 N.W. 626, 627 (Mich. 1909)). Further, five Justices agreed that a "good-faith defense" in this context represented both the plaintiff's burden to prove the elements of the offense and, relatedly, the defendant's opportunity to avoid liability by showing good faith. *See id.* at 175; *id.* at 176 n.1 (Rehnquist, C.J., dissenting).

## II

Under *Wyatt*, then, any defense to private-party liability under § 1983 must derive from the common-law approach and may not rest on freestanding policy grounds. The next question is whether the defense suggested there—whether the defendant acted with malice and without probable cause—is context dependent or applies categorically to all cases involving private-party defendants. Only the former view is faithful to the common-law approach; the latter, like the Supreme Court's qualified-immunity standard in cases such as *Procunier*, *O'Connor*, and *Wood*, generalizes a subjective good-faith defense, unmooring it from its common-law origins. JUDGE RENDELL's opinion, in addition to its policy-based holding, takes this latter view, relying upon our decision in *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994). *See* Rendell Op. at III.A-B. On my reading, however, *Jordan* did not announce a categorical rule, and so we must conduct an independent inquiry based on the common-law approach. And on that score, I think that instead of determining whether a pre-1871 tort is sufficiently analogous, resolution on

10

an alternative ground, also based in the common-law approach, is preferable.

A

*Lugar* and *Wyatt* both concerned "private defendants charged with 42 U.S.C. § 1983 liability for invoking state replevin, garnishment, and attachment statutes later declared unconstitutional." *Wyatt*, 504 U.S. at 159. So too did *Jordan*. Pursuant to a cognovit clause in a commercial real estate lease, the defendants obtained and executed a confessed judgment against the plaintiffs in state court. *Jordan*, 20 F.3d at 1258. Along with their complaint, the defendants invoked a Pennsylvania procedure that required the prothonotary of the court to issue a writ ordering the court's sheriff to garnish the plaintiffs' bank account. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 787 F. Supp. 471, 473-74 (E.D. Pa. 1992) (*Fox Rothschild*). The law required neither pre-deprivation notice nor issuance of a writ of service, and indeed the plaintiffs received notice only after the seizure. *Id.* Unsurprisingly aggrieved, the plaintiffs thereafter sought, among other things, a declaratory judgment that the Pennsylvania procedure was unconstitutional and damages under § 1983.

The district court held that the post-judgment garnishment phase of the procedure violated due process, *id.* at 477-78, but it dismissed the § 1983 action, determining that the defendants were entitled to qualified immunity, *id.* at 479-80. While the case was pending on appeal, however, the Supreme Court decided *Wyatt*. Our question, then, was whether the defendants were entitled to a good-faith defense. *Jordan*, 20 F.3d at 1276. We held that they were, declaring ourselves "in basic agreement" with the Fifth Circuit's holding on remand in *Wyatt* that "[p]rivate defendants should not be held liable under § 1983 absent a showing of malice and evidence that they

11

either knew or should have known of the statute's constitutional infirmity." *Id.* (quoting *Wyatt II*, 994 F.2d at 1120).

In my view, *Jordan*'s holding is best read as limited to the context before it. Immediately after announcing our agreement with the Fifth Circuit, we clarified that by "malice" we had in mind "a creditor's subjective appreciation that its act deprives the debtor of his constitutional right to due process." *Id.* To support this standard, we cited Justice Kennedy's reference, in his *Wyatt* concurrence, to *Birdsall v. Smith*. *Id.* at 1276 n.30. That case concerned a malicious-prosecution action brought by a milk vendor who had been charged, solely on the basis of a report filed with state officials, under a state statute later declared unconstitutional. *See* 122 N.W. at 626-27. We also referred to "Pennsylvania cases that place state law limitations on the use of judgment by confession" because we thought they may "sometimes be relevant on the good faith issue." *Jordan*, 20 F.3d at 1277. This all suggests that we had in mind the factual circumstances of the immediate case—circumstances essentially similar to those of *Lugar* and *Wyatt*.

B

Because *Jordan* cannot be read as expansively as JUDGE RENDELL's opinion suggests, the proper question is whether the abuse-of-process and malicious-prosecution torts, from which the *Wyatt* defense is derived, are sufficiently analogous to the present action, such that our recognition of that defense in *Jordan* is applicable here. For their part, our sister circuits that have confronted the question have so far uniformly concluded that those torts do provide the best analogy. *See, e.g.*, *Janus II*, 942 F.3d at 365; *Danielson*, 945 F.3d at 1102; *Lee*, 951 F.3d at 392 n.2. I think that view is worth questioning,

12

at least to the extent that it supplies the unions a good-faith defense here.

In both *Wyatt* and *Jordan*, the private-party defendants invoked a generally available state procedure. Upon the defendants' independent initiative, state officials were compelled to seize or garnish property of the plaintiffs. That mandate was what rendered the state laws unconstitutional in each case. *See Fox Rothschild*, 787 F. Supp. at 477-78; *Cole*, 710 F. Supp. at 183. Here, Pennsylvania law required the public employer to deduct the fair-share fee from the nonmembers' paychecks, if the collective-bargaining agreement so provided. Yet (and this is the key difference) the agreements triggering collection of the fees were not the fruit of the unions' independent initiative—the relevant public employer was a party to them and necessarily had to agree to them. *See* 71 Pa. Stat. § 575(b)-(c); *see also* 43 Pa. Stat. § 1101.901 (the collective-bargaining agreement is "between the representatives of the public employes and the public employer"). And the collection of the fees—the compelled subsidization of speech—was the constitutional violation. *See Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464, 2478 (2018).

Thus, the relevant state action in our cases stems not merely from the involvement of state officials in unconstitutional conduct, *see Lugar*, 457 U.S. at 941, but also, to some extent, from the command or express authorization of the state to engage in that conduct, *see Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). From this perspective, the torts of abuse of process and malicious prosecution provide at best attenuated analogies. It seems apparent that we are not dealing here simply with a civil "process . . . willfully made use of for a purpose not justified by the law," Thomas M. Cooley, *A Treatise on the Law of Torts* 189 (1876), let alone "the

malicious institution of a civil suit," *id.* at 187. Insofar as the state establishes a law's justified purposes, we confront the use of a procedure for a purpose that the state in part set.[3]

It may be, as the Seventh Circuit observed in *Janus II*, that abuse of process and malicious prosecution are the *most* analogous torts, however imperfect the analogy. *See* 942 F.3d at 365. But it does not necessarily follow that they therefore supply the basis of a defense. By that logic, a defense is potentially always available, no matter how attenuated the connection between the common-law cause of action and the injury alleged. We must remember that "[c]ommon-law principles are meant to guide rather than to control the definition of § 1983 claims." *Manuel*, 137 S. Ct. at 921. True commitment to the common-law approach may eventually require deciding where to draw the line between analogous and non-analogous causes of action. But at least in this case, I find it unnecessary to do so.

In what follows, I describe an alternative basis for a defense, well established at both common law and equity in 1871, and providing a closer similarity to the facts that we confront. Resolving these cases on this ground would both avoid the knotty problems raised by a most-analogous-tort test and preserve the notion, accepted by six Justices in *Wyatt*, that *Harlow* was an exception that should not swallow the common-law rule. Indeed, in my view, that latter benefit is especially compelling, given the recent cogent critiques of

---

[3] It follows from this argument that the parties' other proposed torts—conversion, defamation, tortious interference with contract, and intentional infliction of emotional distress—are also insufficiently analogous. Their elements are even further afield than those of abuse of process and malicious prosecution.

14

qualified immunity as incongruent with the principles of statutory interpretation. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871-72 (2017) (Thomas, J., concurring in part and concurring in the judgment); *Baxter v. Bracey*, 140 S. Ct. 1862, 1864 (2020) (Thomas, J., dissenting from the denial of certiorari); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018).

III

"An unconstitutional act is not a law; . . . it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby County*, 118 U.S. 425, 442 (1886). Derived from the common law, *see Robinson v. Neil*, 409 U.S. 505, 507 (1973), this principle from the late nineteenth century was premised on the then-prevalent legal theory that judges "find" or "declare" rather than "make" law, *see Linkletter v. Walker*, 381 U.S. 618, 622-23 (1965); *Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 370 (1910) (Holmes, J., dissenting). That theory fell out of fashion in the early twentieth century, but the *Norton* principle nevertheless proved remarkably influential. *See, e.g.*, *Ex Parte Young*, 209 U.S. 123, 159 (1908). Most notably, it underlies the Supreme Court's more recent retroactivity jurisprudence—and thus the plaintiffs' theory of liability in the present cases. *See Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 95-97 (1993); *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 540 (1991) (opinion of Souter, J.); *Griffith v. Kentucky*, 479 U.S. 314, 326-29 (1987).

Yet there was a contemporaneous exception to this general view, in which a judicial decision either voiding a statute or overruling a prior decision does not generate retroactive civil liability with regard to financial transactions or agreements conducted, without duress or fraud, in reliance on the invalidated statute or overruled decision. *See, e.g.*,

Benjamin N. Cardozo, *The Nature of the Judicial Process* 146-47 (1921); Oliver P. Field, *The Effect of an Unconstitutional Statute* 221-28 (1935); Note, *The Effect of Overruled and Overruling Decisions on Intervening Transactions*, 47 Harv. L. Rev. 1403 (1934). An assessment of the cases applying this exception demonstrates its applicability in the present context.

The exception appears to have developed as a sort of corollary to originally English legal and equitable doctrines. One such doctrine is that voluntary payments made upon an illegal demand are not recoverable except where the payments were made under an immediate and urgent necessity. *See, e.g.*, Valpy v. Manley (1845), 135 Eng. Rep. 673, 677; 1 C. B. 594, 602-03 (Tindal, C.J.) (citing and quoting Fulham v. Down (1798), 170 Eng. Rep. 820 n.; 6 Esp. 26 n. (Kenyon, C.J.)); Brisbane v. Dacres (1813), 128 Eng. Rep. 641, 645; 5 Taunt. 143, 152 (Gibbs, J.). Another is that money paid pursuant to a contract may not be recovered if the contract was formed under a mutual mistake of law. *See, e.g.*, Bilbie v. Lumley (1802) 102 Eng. Rep. 448, 449-50; 2 East 469, 472. Although nineteenth-century American courts straightforwardly applied these doctrines in the contexts in which they originated, *see, e.g.*, *Bank of U.S. v. Daniel*, 37 U.S. (12 Pet.) 32, 55-56 (1838); *Hunt v. Rhodes*, 26 U.S. (1 Pet.) 1, 15 (1828); *Sprague v. Birdsall*, 2 Cow. 419, 421 (N.Y. Sup. Ct. 1823), they also invoked them when confronting the effects of the practice of judicial review. Two lines of cases—one at law, the other in equity—are especially notable.

## A

At common law, money extracted illegally by taxes or fees could be recovered through an action of assumpsit. *See, e.g.*, 3 William Blackstone, *Commentaries on the Laws of England* \*158-59 (describing as a form of assumpsit an action

16

to recover tax or fee payments to a government or other body of which one is a member).[4] As noted, in *Janus* the unconstitutional act was the compelled subsidization of speech through the payment of the fair-share fees. The plaintiffs here seek a repayment of the fees they paid prior to *Janus* and whose extraction only became illegal as a result of that decision. Several pre-1871 state cases address a similar situation, where repayment of a tax, fee, or other expenditure is sought when the law or court decision under which it was made is declared unconstitutional or overruled. The courts in these cases developed a limitation on such liability, uniformly barring repayment where the initial expenditure was made voluntarily and without duress.

The most succinct formulation of this doctrine came in an 1846 decision of the Maryland high court:

> It is now established, by an unbroken series of adjudications in the *English* and *American*

---

[4] Although the Supreme Court has often referred specifically to tort law when enunciating the common-law approach to § 1983 immunities and defenses, it has never suggested that application of that approach is limited to tort, rather than contract, law where the latter is most applicable. Moreover, the assumpsit action was in fact a form of the writ of trespass on the case—the fountainhead of modern tort law—that officially came to supplant actions in debt due to the institutional rivalry of the Courts of Common Pleas and King's Bench. *See* David Ibbetson, *Sixteenth Century Contract Law:* Slade's Case *in Context*, 4 Oxford J. Legal Stud. 295 (1984). Assumpsit treats misperformance or nonperformance of an implied agreement as a tort-like wrong. *See* John H. Langbein et al., *History of the Common Law: The Development of Anglo-American Legal Institutions* 252 (2009).

> courts, that where money is voluntarily and fairly paid, with a full knowledge of the facts and circumstances under which it is demanded, it cannot be recovered back in a court of law, upon the ground, that the payment was made under a misapprehension of the legal rights and obligations of the party.

*City of Baltimore v. Lefferman*, 4 Gill 425, 431 (Md. 1846). The operative legal fiction—consistent with the Supreme Court's later statement in *Norton*—is that a statute or ordinance subsequently declared unconstitutional is void even at the time the money is transacted pursuant to it, thus creating the "misapprehension." The burden, however, is on the *payor* to establish more than mere reliance on the law's presumptive validity. As the California Supreme Court put it: "The illegality of the demand paid constitutes of itself no ground for relief. There must be in addition some compulsion or coercion attending its assertion, which controls the conduct of the party making the payment." *Brumagim v. Tillinghast*, 18 Cal. 265, 266 (1861). The payment, according to the Ohio Supreme Court, "can only be considered involuntary when it is made to procure the release of the person or property of the party from detention, or when the other party is armed with apparent authority to seize upon either, and the payment is made to prevent it." *Mays v. City of Cincinnati*, 1 Ohio St. 268, 278 (1853). Simply because the law was assumed valid at the time of the payment, and therefore that non-payment might result in legal enforcement proceedings, was not enough. *See Town Council of Cahaba v. Burnett*, 34 Ala. 400, 404 (1859); *see also Town of Ligonier v. Ackerman*, 46 Ind. 552, 559 (1874), *overruled in part on other grounds by Jennings v. Fisher*, 2 N.E. 285, 288 (Ind. 1885).

The Pennsylvania Supreme Court at midcentury also adopted this general doctrine. *See Taylor v. Phila. Bd. of Health*, 31 Pa. 73, 75 (1855); *Borough of Allentown v. Saeger*, 20 Pa. 421 (1853). In *Saeger*, the Court stated in dictum that "[i]f [the money] had been paid under protest, that is, with notice that [the payor] would claim it back, this would repel the implication of an assent, and give rise to the right of reclamation." 20 Pa. at 421. It is unclear, however, if this standard required the payor actually to bring the threatened legal action. Other courts were more explicit in imposing this requirement. *See, e.g.*, *Burnett*, 34 Ala. at 405 ("[T]he case is not altered by the fact, that the party so paying protests that he is not answerable, and gives a notice that he shall bring an action to recover the money back. *He has an opportunity in the first instance to contest th[e] claim at law*." (quoting *Benson v. Monroe*, 61 Mass. (7 Cush.) 125, 131 (1851))).[5]

Finally, although the United States Supreme Court did not, during this period, have a factually similar case, it did approvingly recite this doctrine in analogous situations. For example, in an 1877 case involving payments to Confederate

---

[5] The Alabama Supreme Court's adoption of *Benson*'s language is significant. *Benson*, also an assumpsit action, more nearly approximates abuse of process because the plaintiffs, who were ship owners, only paid after their vessel was attached. Nevertheless, the Massachusetts Supreme Judicial Court still denied recovery. The plaintiffs had the choice of either paying or litigating. *Benson*, 61 Mass. at 131. *Burnett*'s importation of *Benson*'s standard suggests the similarity between the sort of cases described here and abuse-of-process situations (though still litigated in assumpsit). It suggests the closeness of this rule to the one *Wyatt* suggested and our Court adopted in *Jordan*.

19

officials for the right to export cotton, the Court said that to "justify an action against [the payees], either for the return of the money paid . . . or for damages of any kind," "the doctrine established by the authorities is[] that 'a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid.'" *Radich v. Hutchins*, 95 U.S. 210, 212-13 (1877) (quoting *Lefferman*, 4 Gill. at 436, and citing *Brumagim*, 18 Cal. at 265; and *Mays*, 1 Ohio St. at 268); *see also Elliott v. Swartwout*, 35 U.S. (10 Pet.) 137, 153-55 (1836). This voluntariness rule remains the applicable standard. *See McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 38 n.21 (1990).

## B

The doctrine was also applied in equitable actions, usually involving not the payment of a tax or fee, but rather a financial transaction between private parties. Its most well-known enunciation was by Chancellor Kent in 1815: "A subsequent decision of a higher Court, in a different case, giving a different exposition of a point of law from the one declared and known when a settlement between parties takes place, cannot have a retrospective effect, and overturn such settlement." *Lyon v. Richmond*, 2 Johns. Ch. 51, 60 (N.Y. Ch. 1815), *rev'd on other grounds*, *Lyon v. Tallmadge*, 14 Johns. 501 (N.Y. 1817). In addition to general policy grounds, the key principle was, again, that parties may not be relieved of "acts and deeds fairly done on a full knowledge of facts, though under a mistake of the law." *Id.*; *see also Shotwell v. Murray*, 1 Johns. Ch. 512, 515-16 (N.Y. Ch. 1815). Later state equity courts adopted or followed this doctrine, *see, e.g.*, *Doll v. Earle*, 59 N.Y. 638, 638 (1874); *Hardigree v. Mitchum*, 51 Ala. 151, 155-56 (1874); *Harris v. Jex*, 55 N.Y. 421, 424 (1874); *Kenyon v. Welty*, 20 Cal. 637, 642 (1862), as did at least one

federal court, *see In re Dunham*, 8 F. Cas. 37, 38-39 (D.N.J. 1872).

***

When Congress in 1871 enacted the law that became § 1983, it was well established at both law and equity that court decisions that invalidated a statute or overruled a prior decision, and thereby affected transactional relationships—between private parties and government officials or representatives, or between private parties alone—established in reliance on that statute or decision, did not generate civil liability for repayment except where duress or fraud was present. Whatever the nature of the state action in the present cases—whether the state "act[ed] jointly with" the unions or "compel[led] the [unions] to" collect the fees, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019)—the factual circumstances underlying this doctrine bear a substantial similarity to those we confront here. Therefore, in my view the doctrine constitutes "a previously existing, independent legal basis" sufficient to limit the unions' liability under § 1983. *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995).[6] I know of no authority on "§ 1983's history or purposes" that might "counsel against" recognition of this defense, *Tower*, 467 U.S. at 920, and the consistency of its application in law and equity safely permits the conclusion that Congress did not wish to "impinge" on it "by covert inclusion

---

[6] The *Diamond* appellants argue strenuously that this is a case of restitution. Even if it is, every case upon which they rely can be explained according this doctrine. Moreover, they cite cases only from the mid-twentieth century or later. There is no suggestion that the principle they claim was established in 1871. The reverse, in fact, seems to be the case.

in the general language" of § 1983, *Tenney*, 341 U.S. at 376.

## IV

It may be tempting, in cases like the present, to read precedent broadly, or appeal to freestanding principles such as the rule of law and basic notions of fairness. But we must interpret and apply § 1983 as we would any other statute, always prepared for the faithful execution of that duty to result in a seemingly extreme outcome. For even when that does not occur, there is value in adhering to the well-established principles of interpretation.

Because the plaintiffs in these cases have not pleaded any facts, suggesting that their payments were either sufficiently involuntary or exacted on a fraudulent basis,[7] to permit a reasonable person to infer that the unions might be liable, I concur in the affirmance of the orders granting the unions' motions to dismiss.

---

[7] JUDGE PHIPPS asserts that, even accepting the standard I adopt here, the plaintiffs' payments were not voluntary. I think it apparent that none of the plaintiffs have pleaded anything approaching the kind of involuntariness or duress articulated in the cases I discuss.

*Diamond v. Pa. State Educ. Ass'n*, No. 19-2812
*Wenzig v. Serv. Emps. Int'l*, No. 19-3906

PHIPPS, *Circuit Judge*, dissenting.

The central question presented in these consolidated cases, which seek recovery of agency fees garnished from the wages of non-union members, is whether a good faith affirmative defense exists to a First Amendment compelled speech claim under 42 U.S.C. § 1983. I do not see a valid basis for recognizing such a defense. A good faith affirmative defense was not firmly rooted in the common law in 1871 when § 1983 was enacted, and nothing else compels recognition of such a defense today. For that reason, I would reverse the orders dismissing these cases and remand them for further proceedings.

My colleagues see it differently. Judge Rendell recognizes such a defense from precedent and out of consideration of "principles of equality and fairness." Rendell Op. at III.B. In concurring in the judgment only, Judge Fisher does not rely on a good faith defense. Instead, from an examination of pre-1871 common law, he identifies another limitation on the § 1983 cause of action: it may not be used to collect voluntary payments. *See* Fisher Op. at III.A. I disagree with these perspectives and respectfully dissent.

The Supreme Court has articulated standards for supplementing the plain text of § 1983, which itself identifies no immunities or defenses. Such supplementation requires a tradition "so firmly rooted in the common law and . . . supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the

1

doctrine.'" *Owen v. City of Independence*, 445 U.S. 622, 637 (1980) (quoting *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). Even if such a deeply rooted common-law tradition exists, that will still not permit supplementation of § 1983 in a manner inconsistent with the statute's history or purpose. *See Wyatt v. Cole*, 504 U.S. 158, 164 (1992) ("[I]rrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions.").

I.      A GOOD FAITH DEFENSE WAS NOT FIRMLY ROOTED IN THE COMMON LAW IN 1871 WHEN CONGRESS ENACTED § 1983.

The specific inquiry here focuses on whether a good faith defense was firmly rooted in the common law in 1871. But as an initial point of reference, the good faith affirmative defense is not firmly rooted in the common law today – either generally or for any specific cause of action.

In articulating 18 affirmative defenses that must be raised in a responsive pleading, Rule 8(c) of the Federal Rules of Civil Procedure does not include good faith. *See* Fed. R. Civ. P. 8(c). The rule's listing is not exhaustive, and leading treatises supplement those 18 listed defenses, but those treatises do not identify a common-law good faith affirmative defense. *See, e.g.,* Arthur R. Miller et al., Federal Practice and Procedure § 1271 (3d ed., Apr. 2020 Update) (recognizing no common-law good faith affirmative defense); 2 Jeffrey A. Parness, Moore's Federal Practice § 8.08 (3d ed. 2020) (listing affirmative defenses, such as immunities, but not including good faith). If a good faith affirmative defense were deeply rooted in the common law, such as defenses like statute of

2

limitations, laches, or accord and satisfaction, then one would expect to find it listed in Rule 8(c) – or at least to make a showing in a leading treatise.

Similarly, a review of other statutory causes of action reveals that Congress has not understood good faith to be so deeply rooted as to go unspoken. Rather, when Congress wants to include good faith as an affirmative defense, it does so expressly.[1] And that begs the question: if the good faith defense were so well established that it could be assumed "that Congress [in enacting § 1983] would have specifically so provided had it wished to abolish the doctrine," then why did Congress find the need to expressly provide for the defense in many other statutes but not in § 1983? *Pierson*, 386 U.S. at 555.

In sum, the *absence* of a good faith affirmative defense from Rule 8(c) along with its *presence* as a defense in other federal statutes suggests that today the good faith affirmative defense is not firmly rooted in the common law.

---

[1] *See, e.g.*, 15 U.S.C. § 78r (providing a good faith defense to securities fraud); 15 U.S.C. § 1115(b) (providing a good faith defense to trademark infringement); 15 U.S.C. §§ 1640, 1691e(e), 1692k(e), 1693m(d) (providing a good faith defense to claims related to consumer credit protection); 16 U.S.C § 1540(a)(3), (c)(3) (providing a good faith defense to certain claims under the Endangered Species Act); 29 U.S.C. § 259(a) (providing a good faith defense to certain claims under the Fair Labors Standards Act); 29 U.S.C. § 2617(a)(1)(iii) (providing a good faith defense to a liquidated damages claim under the Family Medical Leave Act).

That conclusion, of course, is not dispositive – it could be that a good faith affirmative defense was deeply entrenched in the common law in 1871 but has lost traction over time. *But cf*. Fed. R. Civ. P. 8(c) (continuing to identify the virtually obsolete affirmative defense of injury to fellow servant). To make such a showing would require proof similar to that adduced in *Tenney v. Brandhove*, 341 U.S. 367 (1951), wherein the Supreme Court determined that legislative immunity applied to § 1983 claims. *See id.* at 377-78. In reaching that conclusion, the Supreme Court relied on evidence of that immunity dating back to sixteenth and seventeenth century English law, provisions of the Articles of Confederation and the Constitution, as well as protections specifically articulated in 41 of the then 48 admitted States. *See id*. at 372-76.

By contrast no such evidence is present here. No party identifies a pre-1871 case recognizing a common-law good faith affirmative defense – either as a general matter or in the context of any particular cause of action. Judge Rendell's opinion does not identify any common-law basis for such a defense. Nor do any of the other courts applying a good faith defense to agency fee cases identify any grounding in common law for such an affirmative defense.[2]

---

[2] *See Wholean v. CSEA SEIU Local 2001*, 955 F.3d 332, 334-36 (2d Cir. 2020); *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 392 n.2 (6th Cir. 2020); *Ogle v. Ohio Civil Serv. Emps. Ass'n, AFSCME Local 11*, 951 F.3d 794, 797 (6th Cir. 2020) (per curiam); *Danielson v. Inslee*, 945 F.3d 1096, 1102 (9th Cir. 2019); *Janus v. Am. Fed. of State, Cty. & Mun. Emps., Council 31*, 942 F.3d 352, 364 (7th Cir. 2019) (finding "no common-

The strongest case for such a defense comes from Chief Justice Rehnquist's dissenting opinion in *Wyatt v. Cole*. There, he viewed the good faith defense as "something of a misnomer" because it actually referred to elements of the common-law torts of malicious prosecution and abuse of process. 504 U.S. 158, 176 & n.1. That perspective is telling. Chief Justice Rehnquist identified no authority for the proposition that good faith functions as a transsubstantive affirmative defense – applicable across a broad class of claims, such as the defenses of accord and satisfaction, laches, and res judicata. *See id.* at 175-80. Nor did his dissenting opinion recognize good faith as a claim-specific affirmative defense, such as the defenses of assumption of risk, contributory negligence, or duress. *See id.* At most, Chief Justice Rehnquist determined that the elements of two common-law tort claims could be defeated by proof of subjective good faith. *See id.* at 176 & n.1.

Judge Fisher picks up on that theme. From an examination of the common law, he concludes that in 1871 no cause of action allowed for later recovery of voluntary payments. *See* Fisher Op. at III.A. But unlike the cases he relies upon, the agency fee payments at issue here were not voluntary – they were wage garnishments that were paid to unions.[3] More fundamentally, Judge Fisher's approach is

_____

law history before 1871 of private parties enjoying a good-faith defense to constitutional claims").

[3] *See* 71 Pa. Stat. and Cons. Stat. Ann. § 575(c) (West 1988) (requiring employers to garnish wages for fair-share agency fees for transmittal to unions); *see also* Wenzig Compl. ¶¶ 9-10 (Wenzig App. 42) (alleging that non-union members were

5

analogous to the one that the Supreme Court did not adopt in *Wyatt* – which prompted Chief Justice Rehnquist's dissent. Section 1983 created a new statutory cause of action, not one pre-defined by the common law. Thus, it is immaterial that no pre-1871 cause of action permitted recovery for voluntary payments that were subsequently declared unconstitutional: the Civil Rights Act of 1871 established a new cause of action in part to provide "a remedy where state law was inadequate." *Monroe v. Pape*, 365 U.S. 167, 173 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1977).

For these reasons, I do not see the common law as limiting the scope of a § 1983 claim for compelled speech – either through a good faith affirmative defense or through a separate limitation on the statutory cause of action.

II.    BOTH THE HISTORY AND THE PURPOSE OF § 1983 COUNSEL AGAINST RECOGNITION OF A GOOD FAITH AFFIRMATIVE DEFENSE.

For completeness, even supposing that the common law did recognize good faith as an affirmative defense in 1871, more would be required. Before a deeply rooted affirmative

---

"forced to pay" fair-share agency fees and that those fees were deducted from nonmembers' wages "without their consent"); Diamond Second Am. Compl. ¶ 24 (Diamond App. 74) (alleging that the class representatives were "compelled . . . to pay a financial penalty for exercising their constitutional right to not join a union"), ¶ 39 (Diamond App. 77) (defining the putative class as persons who were "compelled to pay money . . . as a condition of employment").

6

defense can apply to a § 1983 action, it must also be "supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Owen*, 445 U.S. at 637 (internal quotation marks omitted). Put differently, a common-law defense will not be read into § 1983 when it is inconsistent with the history or the purpose of § 1983. *See Wyatt*, 504 U.S. at 164. And neither the history nor the purpose of § 1983 supports the recognition of good faith as an affirmative defense for violations of every constitutional right.

A good faith defense is inconsistent with the history of the Civil Rights Act of 1871. As the Supreme Court has explained, that statute is predicated on the understanding that "Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, *whether they act in accordance with their authority* or misuse it." *Monroe*, 365 U.S. at 171-72 (emphasis added). As this statement makes clear, the history behind the Civil Rights Act, which Congress enacted pursuant to the Enabling Clause of the Fourteenth Amendment,[4] demonstrates the need to remedy actions taken *in accordance with state law*. And thus a good faith affirmative defense – that a state actor was merely following state law – is an especially bad fit as an atextual addition to § 1983.

---

[4] *See* Civil Rights Act of 1871, Pub. L. 42-22, 17 Stat. 13, 13 (Apr. 20, 1871) (entitling the legislation as "[a]n Act to enforce the [p]rovisions of the Fourteenth Amendment . . . and for other [p]urposes").

7

Nor can a good faith affirmative defense be reconciled with the purpose of the Civil Rights Act of 1871. The Supreme Court has identified "three main aims" for § 1983. *Monroe*, 365 U.S. at 173. Those were (i) "to override certain kinds of state laws"; (ii) to provide "a remedy where state law was inadequate"; and (iii) "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Id*. at 173-74. Each of those purposes reflects a dissatisfaction with the redress provided by state law for constitutional violations. It would seem, then, that state law would be the last place to look for limitations on the redress § 1983 allows – the whole point of the statute was to overcome the limitations of state law. Thus, absent some foundation in federal law, incorporating a defense rooted only in state common law into § 1983 is inconsistent with the purpose of that statute.

The later enactment of § 1988 also supports this conclusion. There, Congress allowed for consideration of state common law, but only to *supplement* "deficienc[ies] in the provisions necessary to furnish suitable remedies and punish offenses against law." 42 U.S.C. § 1988. That is quite different than looking to state common law to *limit* the remedies permitted by § 1983.

Thus, even if it were firmly entrenched in the common law, a good faith affirmative defense should not be grafted onto the text of § 1983 – either as a transsubstantive defense (such as accord and satisfaction or res judicata) or a cause-of-action specific defense (such as assumption of the risk or duress).

8

III.    THE ROLE OF GOOD FAITH IN § 1983 LITIGATION DOES
        NOT RISE TO THE LEVEL OF AN AFFIRMATIVE DEFENSE.

Although good faith does not operate as an affirmative defense, it still may have a role in § 1983 litigation. As this Circuit recognized, proof of good faith may negate an element of a § 1983 claim. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277-78 (3d Cir. 1994). Specifically, the gross negligence mental state element required for a procedural due process claim can be rebutted by a showing of subjective good faith through adherence to then-existing law. *See id.* at 1278. That holding was context specific, and it recognized good faith as a means to disprove a mental state requirement. *See id.* at 1277-78. Consistent with Chief Justice Rehnquist's observation, the *Jordan* decision used the term 'good faith defense' as a misnomer – it was actually applying good faith to negate a specific element of a cause of action, as opposed to asserting it as an affirmative defense. *See id.*; *see generally Affirmative Defense*, Black's Law Dictionary (11th ed. 2019) ( "A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true."). Thus, I do not read our precedent as recognizing good faith as an across-the-board affirmative defense, or even as cause-of-action specific affirmative defense. At most, a showing of good faith can negate a mental state element of a claim – such as gross negligence required for a procedural due process claim. *See Jordan*, 20 F.3d at 1277-78. But that is of no moment here because a claim for compelled speech does not have a *mens rea* requirement. *See Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) ("[T]he compelled subsidization of private speech seriously

9

impinges on First Amendment rights[.]"); *see also United States v. United Foods, Inc*., 533 U.S. 405, 408, 416 (2001); *Wooley v Maynard*, 430 U.S. 705, 717 (1977); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Beyond *Jordan*, Judge Rendell relies on "principles of equality and fairness" to justify a good faith defense. Rendell Op. at III.B. But in full context, the Supreme Court made clear that "principles of equality and fairness" were insufficient to establish immunity:

> Although principles of equality and fairness may suggest . . . that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts, such interests are not sufficiently similar to the traditional purposes of qualified immunity to justify such an expansion.

*Wyatt*, 504 U.S. at 168. Nothing about that quotation validates "principles of equality and fairness" as standards for evaluating potential affirmative defenses. As explained above, the appropriate inquiry looks instead to the common law.

But even still, principles of equality and fairness would not carry the day here. Neither equality nor fairness overwhelmingly favors the reliance interests of the unions in pre-existing law over the free speech rights of non-members who were compelled to support the unions. The Supreme Court in *Janus* already accounted for those reliance interests in overturning *Abood*. *See Janus*, 138 S. Ct. at 2484-86; *see also*

10

*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). Those considerations need not be double-counted under the guise of a good faith affirmative defense. And that is to say nothing of the text, history, and purpose § 1983, which make it particularly ill-suited to a construction that elevates reliance interests over the vindication of constitutional rights.

* * *

Good faith was not firmly rooted as an affirmative defense in the common law in 1871, and treating it as one is inconsistent with the history and the purpose of § 1983. Nor does our precedent or even principles of equality and fairness favor recognition of good faith as an affirmative defense to a compelled speech claim for wage garnishments. I respectfully dissent and vote to reverse the orders dismissing the complaints and to remand these cases.